

MM
Miedel & Mysliwiec LLP

September 7, 2021

The Honorable Margo K. Brodie
Chief United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    **United States v. Lothar Maelzner,** 18-Cr-630 (MKB)

Dear Judge Brodie:

I write on behalf of Lothar Maelzner, who is scheduled to be sentenced by Your Honor on September 21, 2021.  Pursuant to a plea agreement with the government, Mr. Maelzner pled guilty on January 30, 2020, to possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).  The parties and the Probation Department agree that Mr. Maelzner's total offense level under the guidelines is 24, his criminal history category is I, and that his resulting advisory sentencing range is 51-63 months.  *See* Presentence Report (PSR) at ¶¶ 36, 39, 85.  There is no statutory minimum sentence required.  For the reasons set forth below, I respectfully urge the Court to impose a non-custodial sentence.  Under the unusual circumstances present here, such a sentence would comport with the sentencing directives in 18 U.S.C. § 3553(a).

## A.  Introduction

This is a possession of child pornography case.  The federal sentencing guidelines covering child pornography offenses are deeply problematic, as the Court well knows.  As a result, district courts across the country, and especially within the Second Circuit, have regularly imposed sentences steeply below the applicable guideline ranges, a practice that was ultimately endorsed by the Second Circuit in *United States v. Dorvee,* 616 F.3d 174 (2d Cir. 2010).[1]  Still, most child pornography offenders spend some time in prison, even those convicted of the lowest possessory offense.

This case is different, however.  This case is different because the *kind* of child pornography Lothar Maelzner sought out, consumed, and possessed, is qualitatively and fundamentally distinguishable from the material so often seen in these cases.  The images Mr.

---

[1] Judges within the Second Circuit varied downward from the guidelines in child pornography cases 73.1% of the time. *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/2c20.pdf

Maelzner possessed, although unquestionably child pornography, did not depict sex acts, penetration, S&M – did not show young children being assaulted by adults. Instead, the material he possessed consisted mostly of still photos of primarily (though not all) pubescent girls modeling in various states of undress, or in sexually explicit poses. *See* PSR at ¶ 15. I have represented a number of individuals charged with possession of child pornography, and the difference between the material in those cases and here is palpable. On the spectrum of imagery that constitutes unlawful child pornography, there can be no question that the images possessed by Mr. Maelzner fall well on the mild end.

This case is also different because two mental health professionals, one retained by Pretrial Services and one retained by the defense, agree that Mr. Maelzner is not a pedophile and does not appear to present any risk to children. It is unusual that both the Court's and the defense's psychologist share such a conclusion, and it bodes well for Mr. Maelzner's future. Moreover, Mr. Maelzner has enthusiastically embraced his weekly therapy sessions through Pretrial Services, which by all accounts have had a very positive impact on him.

Lastly, this case is different because Lothar Maelzner has been under home confinement – in a small one-bedroom apartment – for *three years*. Other than approved activities, such as a daily hour-long walk, Mr. Maelzner has barely left his apartment since his arrest in September 2018. While such confinement is not comparable to prison, it unquestionably has severely limited Mr. Maelzner's liberty, and he has already felt deeply the consequences of his actions. Accordingly, because this case is different, for the reasons articulated and detailed further below, we respectfully ask the Court for a non-custodial sentence. Such a sentence, while unusual, is not unique and the facts and circumstances here warrant it.

## B.  Background

Lothar Maelzner was born on December 22, 1975, in Caracas, Venezuela to Walther Maelzner Paredes, an importer/exporter of car parts, and Marina García, a special education teacher. PSR ¶ 44. For three years, early in his childhood, Mr. Maelzner lived in Staten Island due to his father's work, but most of his early life was spent in Venezuela. *Id.* ¶ 48. In 1983, when Lothar was seven years old, his father was diagnosed with stomach cancer, and Walther passed away in two years later at the age of 56, when Lothar was nine. *Id.* ¶ 44. Walther's death had tremendous and rippling consequences for each of the family members, including Lothar.

In his letter to the Court, Lothar's younger brother, Khristien, describes the impact of his father's death on the family:

> [Walther's] death was a traumatic and unexpected event. My father's premature absence in [my brother's and my] early childhood years determined our future psychology and behavior as adults. My mother never remarried and she had to play the role of father and mother at the same time. She had to raise two children alone while working as a special education teacher while she finished a second degree in Political Science and Social Psychology. I remember this as a complicated turning point for a single woman who loses her husband and who is forced to make sudden changes among many other vicissitudes. This is how we

grew [up], this is how we were formed, under the tutelage of a seasoned, hard working mom who gave us the best example and above all a religious foundation and spiritual values to configure future men of good. My mother expected highly from my brother after my father passed away. This has been a tension point between their relationships.

Exhibit A at 1.

In the years following his father's death, Lothar's grandfather, Marcos García, helped his mother raise the two boys and served as a father figure to them however he could. Sadly, after nearly a decade as a consistent presence in his grandsons' lives, Mr. García, too, passed away from lung cancer in 1992, when Lothar was just sixteen. PSR ¶ 46. Losing his two most prominent male role models during childhood undoubtedly had lasting consequences for Lothar's mental health.

In 1994, after high school, Mr. Maelzner enrolled at the Universidad Central de Venezuela in Caracas, where he studied philosophy. As his mother explains in her letter to the Court, Lothar never earned his bachelor's degree, despite being an excellent student, due to the political climate in Venezuela at the time:

> During his time of college and university years, [Lothar] was a good student with good grades and sometime[s] he exceeded expectations in some topics during his school years. His investigations and deliberations in his five years of university career, at the School of Philosophy at the Central University of Venezuela, he wrote his dissertation on [Immanuel] Kant Moral Philosophy, which he couldn't defend before an academic jury because of the permeated Marxist ideology among many academics, which still prevails in this University. This clashing of ideologies during his last years of studies causes him a lot [of] stress and disappointments. His dissertation [advisor] was very evasive at the end, because she was granted a government position in the Chavez administration. He tried to [finalize his dissertation under] a different [advisor,] but many professors did not want to help him out because of the [nature of his work], [so] after two years of attempts and corrections [he was] very disappointed and […] overwhelmed.

Exhibit B at 1.

In late 2002, when he was 26, Mr. Maelzner decided to leave behind Venezuela's increasingly troubled economic and political circumstances and emigrate permanently to the New York City area. For the first three years after arriving in the United States, Mr. Maelzner struggled to support himself, working at various delis, cafeterias, and restaurants, and freelancing as a web designer. PSR ¶¶ 76-77. In 2006, Mr. Maelzner completed a seven-month American Language Program, an intensive English-as-a-foreign-language course, at Columbia University's School of Professional Studies. *Id.* ¶ 64. Later that year, he found his first formal job in the U.S. as a part-time customer service representative at Atlantic Bank of New York (a subsidiary of New York Community Bank). He left that position after six months upon securing a job in the IT department at Mercantile Bank, but was laid off in 2008 because of the economic crash. *Id.* ¶¶ 74-77.

In 2010, Mr. Maelzner was hired by Burberry, the luxury fashion brand, as an executive support and IT team leader. *Id.* ¶ 72.  In subsequent years he also held positions in the IT departments of Equinox and Tiffany & Co. Eventually, in 2016, Mr. Maelzner became an IT manager at Max Mara USA, the fashion designer, a position he held until his arrest in 2018. *Id.* ¶¶ 69–70.

Beyond his significant employment history, technical knowledge, and remarkable success as a first–generation immigrant to the United States, Mr. Maelzner is a deeply thoughtful and spiritual man, reading and studying philosophical and religious texts in his free time, and regularly attending church.  In his letter to the Court, attached as Exhibit C, he explains how fundamental religion and philosophy are to his understanding of the world.

Following two earlier unsuccessful marriages that broke up largely due to religious differences, Mr. Maelzner married P. Cruz in 2017, after dating her for several years.  *See* PSR at ¶¶ 49–51. Ms. Cruz was, understandably, devastated by the news of her husband's arrest and the discovery of his other life.  But through a tremendous amount of work, the couple has strengthened its bonds during these last three years, and Ms. Cruz remains fully supportive of her husband, whom she knows to be a remorseful, supportive, kind-hearted, attentive, intelligent, and caring man, despite his flaws.  I respectfully urge the Court to consider her letter because it eloquently describes the pain she endured, but also the path toward redemption he has embarked on.  *See* Exhibit D; *see also* Exhibit DD, Letter from Ms. Cruz's mother.

## C.  Circumstances of the Offense

Mr. Maelzner was arrested for being in possession of a large number of images that constitute child pornography.  *See* PSR at ¶ 28.  Those images were contained on a hard drive that was seized at LaGuardia Airport when he returned from a business trip to Canada.  While the number of images is not in dispute, it should be placed into context, and there is an explanation for its size other than the assumption that Mr. Maelzner was simply an insatiable consumer of such imagery.  When accessing certain websites where he could find such material, he would be presented with a series of thumbnail pictures.  In order to see the thumbnails in regular size, he was required to download the images.  However, the regular size photos were contained in bulk files with hundreds, sometimes thousands of other images.  If Mr. Maelzner was interested in a particular image in regular size, he was required to download the entire file. Once downloaded, he could access the full-sized image he was interested in.  While Mr. Maelzner also frequently viewed other images contained in the bulk files he had downloaded, he almost never viewed all of them, and has not, in fact, seen all of the imagery on his hard drive.  Consequently, the sheer number of images, while understandably concerning, does not adequately reflect culpability in this case.

More important is the nature of the child pornography possessed by Mr. Maelzner.  As discussed above, what stands out is that virtually all of his files consist of still images, not videos,[2] that the stills and videos depict mostly pubescent (also some pre–pubescent) females

---

[2] The Probation Department has identified approximately 13 videos out of almost 29,000 files.  *See* PSR at ¶ 15.

posing for the camera, and that none of the images show sex acts of any kind.  Unlike most other defendants charged with this crime, Mr. Maelzner possessed no images or videos showing children engaged in sex, penetration, S&M, or anything else remotely violent.  None of the images depict adults engaging in sexual behavior with children.  Indeed, Mr. Maelzner consistently searched for modeling-like imagery, rather than sexual performances.  Also important is the fact that, unlike many defendants charged with this crime, Mr. Maelzner never shared or distributed images, never took part in a peer-to-peer program, and never participated in chats with other purveyors of these files, let alone with purported children. Thus, while the sheer number of images may be initially startling, their actual content rests far on the mild side of the spectrum of imagery found in these kinds of cases.


### D.  Psychological Evaluations and Treatment

Immediately after his arrest in late September 2018, Mr. Maelzner began treatment through Pretrial Services at New York Mental Health Group under the supervision of Dr. Jennifer McCarthy.  As is standard, Dr. McCarthy administered a battery of psychological tests that formed the basis of an evaluation report she prepared in November 2018, shortly after his treatment began.  *See* McCarthy Report, attached as Exhibit E.[3]  In addition, Dr. Alexander Bardey, retained by the defense, evaluated Mr. Maelzner in spring 2019.  Rather than administer the same standard psycho-sexual tests, Dr. Bardey used the raw data of Dr. McCarthy's test results to form his own conclusions, which, as it turns out, did not differ from Dr. McCarthy's.  *See* Bardey Letter, Exhibit F.

As Dr. Bardey concludes, a determination also reached by Dr. McCarthy, Mr. Maelzner is not a pedophile and presents a low risk for reoffending.[4]  Further, Dr. Bardey concludes that Mr. Maelzner does not present a risk to the community.  These are obviously significant determinations – ones not always reached in child pornography cases.  Indeed, both the objective psychological tests, as well as Mr. Maelzner's background and sexual history, led these examiners to conclude that his possession of child pornography appears to be related to his obsession with and addiction to internet pornography, rather than a predilection for and sexual interest in children.  Indeed, none of the objective tests administered to Mr. Maelzner reflect the kinds of results found in cases involving pedophiles or child molesters.  These conclusions should give the Court some comfort and suggest that the community does not need to be protected from Mr. Maelzner and that incapacitation is therefore not a necessary goal of the sentence here.

Since shortly after his arrest nearly three years ago Mr. Maelzner has participated in weekly mental health treatment through Pretrial Services's provider, New York Mental Health

---

[3] Because the psychological evaluations contain private information about mental health, they are redacted from the publicly filed version of this memorandum.

[4] According to her report, Dr. McCarthy's testing revealed that Mr. Maelzner is sexually attracted to adolescent and adult females, that he does not offer rationalizations frequently found in pedophiles, that he registered low on an impulsivity scale, and that the *Bumby Cognitive Distortions Scale – The Molest Scale* – a 38-item scale that assesses the cognitive distortions of child molesters — showed no significant findings.  *See* McCarthy Report at 12-13, Exhibit E.

Group.  These therapy sessions have been extremely valuable for Mr. Maelzner, and he has enthusiastically responded to his treatment.  As set forth in Dr. Bardey's letter, Mr. Maelzner suffers from psychological and emotional issues that warrant intense and long-term therapy and treatment.  His obsession with internet pornography, for example, was worrisome because it seemed to interfere with his ability to engage in normal adult intimate relationships and appeared to have led him down the path that ended with his arrest on these charges.  Fortunately, Mr. Maelzner has engaged extremely well with the psycho-sexual therapy and treatment he has been receiving at N.Y. Mental Health Group.  As the monthly reports from NYMHG reveal (as noted in Dr. Bardey's letter), he has been conscientious about participating in his treatment regimen.  *See also* Monthly Progress Report, August 2021, Exhibit G.   More importantly, he himself reports the positive effect therapy has had on him, and he is absolutely committed to continuing treatment for as long as necessary.  *See* Maelzner Letter, Exhibit C.  Furthermore, his wife describes in her letter how open and committed he has been to exploring the reasons for his behavior, and the intense work he has been doing within their marriage to receive her forgiveness and regain her trust.  *See* Letter from P. Cruz, Exhibit D.

## D.  Purported Aggravating Facts Set Forth in the PSR

The PSR contains certain facts about Mr. Maelzner's conduct that have previously been raised by the government as potentially aggravating.  These concerns are addressed here.

### 1.  *Mr. Maelzner's Work Computer*

One issue raised about Mr. Maelzner concerned his actions on the day following the seizure of his hard drive at the airport.  *See* PSR at ¶ 13, 21.  As noted above, Mr. Maelzner worked as an IT manager at Max Mara.  Following the traumatic events at the airport, and with a fear that federal agents would reach out to his employer and he would be summarily fired, Mr. Maelzner went to work the next morning with the intention of resigning if he was not terminated.  He had, on occasion, used his work computer to download adult and child pornography onto an external hard drive he kept for that purpose.  He used his work computer (after hours) because the internet connection was faster than at home, and because he shared a small apartment with his wife from whom he kept his internet pornography addiction. His work computer was an iMac, so for purposes of downloading pornography, he created a Windows partition on the Mac (so it would operate like a Windows machine).

Mr. Maelzner's work computer also contained a variety of personal information, such as bank account numbers, social media logins, passwords, and payroll data.  In light of the likelihood that he would be fired, he erased all such personal information from the computer so that it would not remain on the machine for the next employee.  He also erased the Windows partition and all data associated with it.  The office ran on the MacOS-iOS systems and there was no need for the Windows partition he had installed to remain on the computer.  Mr. Maelzner had never downloaded pornography onto the iMac's hard drive, but he was concerned about cookies or other files remaining on the system that would, at the very least, be embarrassing to him.  He believed that by erasing the Windows partition, any traces of his searching habits would be erased as well.  As the Probation Department appears to recognize (PSR ¶ 21), it is important to note that Mr. Maelzner's actions were not driven by an effort to obstruct a criminal investigation.  He was well aware that the devices recovered by law

enforcement the day before contained all the evidence needed against him. His only concern was to eliminate his footprint from his work computer so that it could be returned as a clean machine. He did not, for obvious reasons, wish for Max Mara to find personal and embarrassing information on his computer after his departure, including his history of using a work computer to download pornography.

2. _Contact with Prostitutes_

As discussed in Dr. Bardey's letter, Mr. Maelzner has employed the services of prostitutes, most recently in the Dominican Republic. _See_ Exhibit F at 3. Mr. Maelzner also reported to federal agents upon his detention at the airport that on one occasion he had contemplated hiring an underage adolescent female prostitute, although the meeting never occurred. _See_ PSR at ¶ 8. The circumstances of that situation were as follows. On a business trip to the Dominican Republic, Mr. Maelzner met a woman named Gabriella, who appeared to be a prostitute, but also arranged encounters with other prostitutes. Mr. Maelzner became friendly with her, and over the course of the next couple of years he remained in frequent contact with her. On visits to the Dominican Republic, Gabriella would arrange encounters for Mr. Maelzner with women who all were, at Mr. Maelzner's insistence, over the age of 18. On one occasion, early on, Gabriella asked if Mr. Maelzner wished to meet with a 15-year-old prostitute. Although he considered the idea, he ultimately rejected the offer. Mr. Maelzner has never had any sexual contact with a minor, and other than this discussion about hiring an underaged prostitute, which never came to fruition, he has never contemplated it.[5]

Mr. Maelzner paid Gabriella for her services, and she frequently asked him for money. On one occasion she sent him a picture of her ten-year-old daughter (fully clothed) and asked him for money for her school fees. This image was found on Mr. Maelzner's Google drive. The image was not sent or received for sexual gratification. Eventually, Mr. Maelzner broke off contact with Gabriella.

3. _Deceptive Behavior_

The government has in the past expressed concern about the fact that Mr. Maelzner took certain steps to hide his tracks and that he was not truthful when confronted by federal agents at the airport. It is true that Mr. Maelzner employed a virtual private network ("VPN") to hide the IP addresses of the computers he was using to download pornography, including child pornography. He also installed a TOR browser in order to search the dark web. _See_ PSR at ¶¶ 7-9. These facts do not make Mr. Maelzner more (or less) culpable. Although he was an IT manager and therefore possesses more computer knowledge than the average person, the use of a VPN or TOR browser does not require specialized knowledge or skill. A quick Google search reveals that the use of VPNs is increasingly common and does not call for any special computer expertise. The existence of the dark web is also widely known, as is the need for a TOR browser to search it.

---

[5] It is also worth noting that Mr. Maelzner's wife describes his behavior with their nieces and nephews as entirely appropriate. No one in the family has ever had any concern that his relationships with children were anything other than correct and loving. _See_ Exhibit D.

Miedel & Mysliwiec • 80 Broad Street, Suite 1900 • New York, New York 10004 • (T) 212-616-3042 • (F) 800-507-8507 • www.fmamlaw.com

It is also correct that Mr. Maelzner was initially evasive and not entirely truthful when confronted by DHS agents at LaGuardia Airport. Mr. Maelzner was deeply frightened, nervous, and shocked at that moment. Returning from a business trip along with his boss, he was snatched out of line by DHS agents and taken to the side. Embarrassed, he urged his boss to continue on to baggage claim without him. Once the agents revealed their true intention, it became clear to Mr. Maelzner that his life was about to be fundamentally changed. His personal life, his professional life, his entire future – all were suddenly uncertain. In an ideal world, even under such stressful circumstances, a person should be forthcoming and honest. Mr. Maelzner was not, but his actions that day at the airport – and he eventually did answer honestly and provide his passwords – should be understood in context.

## E.  A Non-Custodial Sentence Is Consistent With 18 U.S.C. § 3553(a)

As the Court is well aware, the Second Circuit Court of Appeals concluded in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), that district courts were free to disregard the child pornography guidelines based simply on policy disagreements with the guideline, cautioning: "District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2—ones that can range from non-custodial sentences to the statutory maximum—bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188. Following its holding in *Dorvee*, the Second Circuit has consistently maintained this position. *See, e.g., United States v. Alhakk*, 505 Fed.Appx. 51, 55 (2d Cir.2012) ("[T]he court noted that it had given 'special consideration' to the concerns expressed in *Dorvee*.... Based on all of these considerations, the court concluded that a below-Guidelines sentence ... was sufficient but not greater than necessary to fulfill the requirements of § 3553(a)."); *United States v. Chow*, 441 Fed.Appx. 44, 45 (2d Cir.2011) ("*Dorvee* recognizes district courts' post-*Booker* authority to 'vary from the Guidelines range based solely on a policy disagreement with the Guidelines,' and encourages courts to take seriously that discretion 'in fashioning sentences under § 2G2.2' for child pornography defendants.") (internal citations omitted); *United States v. Tutty*, 612 F.3d 128, 133 (2d Cir.2010) ("[T]he district court should ... bear in mind that the 'eccentric' child pornography Guidelines, with their 'highly unusual provenance,' 'can easily generate unreasonable results' if they are not 'carefully applied.'") (citing *Dorvee*, 604 F.3d at 98).

Joining the more than 70% of child pornography cases in which judges in the Second Circuit have imposed below guideline sentences does not mean, of course, that a non-custodial sentence is appropriate. That said, the Sentencing Commission's variance statistics do not distinguish between simple possession, and more serious charges such as receipt or distribution. Indeed, courts nationwide have increasingly noted the comparatively lower culpability of defendants convicted of *possessing* child pornography (as opposed to distribution, production and physical abuse), and have, with greater frequency, imposed non-custodial sentences for those defendants. *See, e.g., United States v. Autery*, 555 F.3d 864, 867 (9th Cir.2009) (affirming non-Guidelines sentence of five years of probation for possession of child pornography); *United States v. Stall*, 581 F.3d 276, 277–78 (6th Cir.2009) (affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of supervised release for defendant convicted of two counts of possession of child pornography); *United States v. Prisel*, 316 Fed.Appx. 377, 378 (6th Cir.2008) (affirming non-Guidelines sentence of one day in prison followed by

eighteen months of home confinement for possession of child pornography); *United States v. Rowan*, 530 F.3d 379, 380 (5th Cir.2008) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States v. Polito*, 215 Fed.Appx. 354, 355 (5th Cir.2007) (per curiam) (affirming non-Guidelines sentence of five years of probation with one year of house arrest for possession of child pornography); *United States v. Crespo–Rios*, No. 08–CR–208, 2015 WL 6394256, at *1 (D.P.R. Oct. 19, 2015) ("[R]esentencing Defendant to the same sentence—that is, time served followed by a long period of supervised release—is justified in view of each of the sentencing factors outlined in 18 U.S.C. § 3553."); *United States v. Mallatt*, No. 13–CR–3005, 2013 WL 6196946, at *13 (D.Neb. Nov. 27, 2013) (finding that, for defendant convicted of one count of possession of child pornography, "sentence of time served, followed by six years of supervision with special conditions including intensive treatment is adequate to fulfill the goals of sentencing ..."); *United States v. Evren*, No. 10–CR–131 (JG) (E.D.N.Y. Feb. 26, 2013) (ECF No. 59) (imposing non-Guidelines sentence of three years' probation for defendant who pleaded guilty to one count of possession of child pornography); *United States v. Meillier*, 650 F.Supp.2d 887, 887 (D.Minn.2009) (imposing non-Guidelines sentence of one day of confinement followed by thirty years of supervised release on defendant convicted of possession of child pornography); *United States v. Boyden*, No. 06–CR–20243, 2007 WL 1725402, at *10 (E.D.Mich. June 14, 2007) (imposing non-Guidelines sentence of one day of confinement followed by three years of supervised release, the first year of which to be served in a community correctional facility).

As the Court knows, the late Judge Weinstein was at the forefront of analyzing culpability in child pornography cases and concluding that for the basic possessory offense, noncustodial sentences were often appropriate. *See e.g. United States v. R.V.*, 157 F. Supp. 3d 207, 209 , 224 (E.D.N.Y. 2016) (imposing a sentence of time served with 7 years of supervision on a defendant facing a guideline of 78-97 months, and observing that "prosecution under the current sentencing framework has largely failed to distinguish among child pornography offenders with differing levels of culpability and danger to the community. The applicable structure does not adequately balance the need to protect the public, and juveniles in particular, against the need to avoid excessive punishment, with resulting unnecessary cost to defendants' families and the community, and the needless destruction of defendants' lives."); *United States v. E.L.*, 188 F. Supp. 3d 152, 156 (E.D.N.Y. 2016) (imposing a sentence of probation on a defendant facing a guideline of 51-63 months and observing: "In the present case, a sentence of probation, with strict controls and required continuing treatment, is appropriate. Defendant's life will always be shadowed by the stain of a federal felony conviction for a sex-related crime. Extensive restrictions affecting where he can live and work, and how he will be controlled, will follow him. An incarceratory Guidelines sentence would have an adverse impact on the substantial progress that defendant has already made through his participation in individual and group therapy. It will deprive his family of vital financial and emotional support while doing little to further protect the public. It will unnecessarily add to taxpayers' burdens."); *United States v. D.M.*, 942 F. Supp. 2d 327, 330 (E.D.N.Y. 2013) (imposing a sentence of probation for a defendant facing a guideline range of 78-97 months, and observing: "An incarceratory Guidelines sentence will impede or cause regression in the substantial progress that defendant has made through individual and group therapy while on bail. Justice for the victims of this crime—and for society's future interest in seeing to it that defendant engages in no further criminal activity—is best served through treatment and supervision outside of prison.").

The question for the Court is whether Lothar Maelzner's case falls in the category of cases where a non-custodial sentence is warranted.  I urge the Court to answer that question in the affirmative.  First, Mr. Maelzner only downloaded child pornography.  He did not distribute it, he was not a member of a file sharing service that gave others access to his collection, and he did not engage in any kind of chatting with other like-minded individuals, let alone with minors.

Second, as discussed above, the kind of material that Mr. Maelzner sought and possessed clearly constitutes the mildest form of child pornography.  Third, mental health professionals who examined Mr. Maelzner have not identified pedophilic tendencies and believe that he does not constitute a danger to the community, especially if he continues to engage in mental health treatment and is supervised by the Department of Probation.[6]

Fourth, Mr. Maelzner has now had three years – all of which were spent in strict home confinement – to engage in reflection and self-analysis.   He writes to the Court:

> During my time in home confinement which has spanned almost three years, I have spent countless hours thinking and reflecting about what I did, why I did it, and the effect of my actions on others. Sometimes, I am close to despair from the guilt I feel due to my actions.  I realized that each victim represents a young life with hopes and innocent dreams that were shattered by coercion and force. I recognize that I should have known the consequences at the time, but sadly I did not.

Letter from Lothar Maelzner, Exhibit C.  Mr. Maelzner's wife, who has stood by him during this excruciating time, and has been a first-hand witness to his transformation, corroborates his account:

> During the time that Lothar has been on bond, I have witnessed him acknowledge his mistakes and reflect on how his actions have impacted all those who love and care for him.  Due to the stigmatizing nature of the offense, he has been out of work for the past three years, but I have seen him use his time to reflect on his actions, devise a plan to start his own business, further his IT skills and read books of interest maintaining a level of healthy mental activity.

Letter from P. Cruz, Exhibit D.

In all of these respects, Mr. Maelzner can be categorized as being among the least culpable perpetrators of a crime – possession of child pornography – that, as Judge Weinstein and others have determined, is the least serious of the child pornography related offenses.  *See*

---

[6] The Court should be further comforted by the statistics about recidivism for non-production child pornography offenders, as calculated by the Sentencing Commission.  The Commission reports that only 4.3% of such offenders engaged in another sex related crime following their conviction.  *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf

*e.g. United States v. R.V.*, 157 F. Supp. 3d at 210 "• **Possession-only child pornography users:** This category includes those viewers and consumers of child pornography who *download* images of child pornography. It frequently includes individuals with the lowest degree of culpability. Often, defendants in this category do not have the *mens rea* threatening actual contact with a minor.") (emphasis in original).

The sentencing range for people convicted of possession of child pornography spans from no jail to 10 years. Surely if Congress had intended for everyone convicted of this offense to be imprisoned, it would not have drafted the statute to allow for non-custodial sentences. And if some offenders do qualify for a non-custodial sentence, as the statute intends, then Lothar Maelzner, for the factors identified above, should be a member of that group.

## F.  Conclusion

Mr. Maelzner is deeply flawed. He has been an imperfect husband, harbored deep sexual secrets, lied, and, more importantly, has committed a crime. By focusing on the mitigating facts present in this case I do not mean to suggest that he is undeserving of punishment – as well as of rehabilitation and treatment. The question is simply whether *prison* must be part of that punishment. As the Court knows, Mr. Maelzner's criminal actions have caused him to lose his job and profession, in which he had achieved significant success. He will be required to register as a sex offender, a stigma he must carry with him for at least 20 years. He will forever be a federal felon convicted of a sex-related crime. He has had to endure the burning shame and humiliation brought by the knowledge that his family and friends – and, indeed, anyone who Googles him – knows about his arrest and conviction for this crime. He will be on some kind of federal supervision for years to come, during which time the government can enter and search his house at will, monitor his internet usage, and restrict his movements. And, he has spent three full years locked into a small apartment in the Bronx, without an ability to visit friends and relatives, go to the movies, explore the outdoors, or live the life of a normal person. He has literally been a prisoner in his home for 36 months. These are all punishments that are the consequence of his crime, even if they are not prison.

Under the circumstances, these punishments are sufficient to satisfy the factors in 18 U.S.C. 3553(a) that call for just punishment, respect for the law, specific and general deterrence, and protection for society. Possession of child pornography is different than most other crimes. It is probably fair to say that no one *wants* to be the kind of person who is drawn to, seeks out, and consumes imagery of naked sexualized children. It is a compulsion best treated by mental health professionals. Punishment and deterrence in particular are of limited utility where the drive to commit a crime is only partially under the defendant's control. Lothar Maelzner does not deny that at the time of his arrest he was in a bad state. But the arrest and the accompanying rupture in his life also brought a silver lining. They forced him to confront his demons, to assess where his life was heading, and to consider how crucial human relationships – especially his marriage – were to his achieving a state of happiness.

For three years, Mr. Maelzner has been engaging in self-improvement. He has worked tremendously to repair the damage his actions caused in his marriage. He has reflected deeply about his crime, its impact, and its causes within him. He has continued his education, digesting philosophical and religious texts to improve himself and to become a better person.

He has enthusiastically embraced therapy and considers continued treatment to be an imperative for sustaining his mental health. He has spent much time thinking about and exploring future employment – within the obvious limitations that a conviction such as this place on one's ability to obtain work – thinking creatively about starting his own business.

All of these endeavors are commendable and bode well for Mr. Maelzner's future. He understands the seriousness of his crime, and he has learned from it. He is dedicated to building a meaningful future that allows him to be a productive member of society, despite his crime. His rehabilitation is well on its way and will undoubtedly be enhanced by continued supervision and mental health treatment. This man does not need prison, now, three years after the fact. And society is also not better off with Mr. Maelzner's rehabilitative efforts put on hold so that we can extract our pound of flesh.

Accordingly, for all these reasons, I respectfully urge the Court to allow Mr. Maelzner to continue to prove himself, and to impose a non-custodial sentence, fashioned in any way the Court sees fit. Such a sentence would be reasonable and just under the circumstances and would comport with the sentencing directives of 18 U.S.C. § 3553(a).

Thank you for your consideration.

Sincerely,

/s/

Florian Miedel
*Attorney for Lothar Maelzner*

Cc:    AUSA Francisco Navarro